Marlee Goska (Alaska Bar No. 2305043)
Rebecca Noblin (Alaska Bar No. 0611080)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
(907) 350-4822
mgoska@biologicaldiversity.org
rnoblin@biologicaldiversity.org

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br><br>*Defendants*,<br><br>KING COVE CORPORATION, CITY OF KING COVE, and STATE OF ALASKA,<br><br>*Defendant-Intervenors*. | Case No. 3:26-cv-00272-ACP<br><br>**LEAD CASE** |
| NATIVE VILLAGE OF HOOPER BAY, et al.,<br><br>*Plaintiffs*,<br><br>v. | Case No. 3:26-cv-00274-ACP<br><br>**CONSOLIDATED** |

U.S. ARMY CORPS OF ENGINEERS, et al.,

*Defendants*,

KING COVE CORPORATION, CITY OF KING COVE, and STATE OF ALASKA,

*Defendant-Intervenors*.

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Clean Water Act, 33 U.S.C. §§ 1251–1388; National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m; Endangered Species Act, 16 U.S.C. §§ 1531–1544; Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–3233; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

## INTRODUCTION

1. Plaintiffs Native Village of Hooper Bay, Native Village of Paimiut, Chevak Native Village, and Center for Biological Diversity challenge the decision of the U.S. Army Corps of Engineers (Corps) to issue a Clean Water Act (CWA) section 404 permit for the construction of a road through the Izembek National Wildlife Refuge (Izembek Refuge). Plaintiffs further challenge the U.S. Fish and Wildlife Service's (Service) biological opinion, pursuant to the Endangered Species Act (ESA), for the permitting decision, and the Corps' reliance on it.

2. The Izembek Refuge is located on a narrow isthmus at the end of the Alaska Peninsula, between the Bering Sea and the Gulf of Alaska. Nearly the entire Refuge is designated wilderness, and its extensive tidal marshes and eelgrass beds

provide foundational habitat for a rich and diverse array of fish, birds, and mammals, including caribou, brown bears, and the ESA-listed northern sea otter. The Refuge serves as a globally important staging, feeding, and wintering habitat for migratory birds, including the ESA-listed Steller's eider, and important subsistence species such as black brant, emperor geese, and cackling geese.

3. In October 2025, the U.S. Department of the Interior (Interior) entered an unlawful land exchange to trade away a 484-acre corridor through Izembek Refuge's narrow isthmus. Interior traded the lands to King Cove Corporation (KCC), an Alaska Native corporation, for the purpose of constructing a road through one of the most productive ecosystems in the world.

4. The Corps, Interior, and the Service have repeatedly concluded that a road and associated activities in the heart of the Izembek Refuge would cause irreversible damage, including to migratory birds and their habitat. All three have also concluded that a marine ferry alternative would avoid this irreversible damage and serve the needs that KCC seeks to meet with a road.

5. Despite these findings, on July 10, 2026, the Corps issued a 404 permit to the Alaska Department of Transportation and Public Facilities (ADOT) authorizing construction of a road through the Izembek Refuge. The project includes construction of an 18.9-mile road owned by KCC, with 85 drainage culverts and one bridge, development of two dedicated material sites for gravel and rock material, fill of 5.28

acres of waters of the United States with 40,000 cubic yards of gravel and riprap, and mechanical clearing of wetlands and other waters to construct the roadway.

6. After ESA section 7 consultation with the Corps regarding the permitting decision, the Service issued a biological opinion on June 18, 2026. The biological opinion concludes that the road would not jeopardize the continued existence of threatened Alaska-breeding Steller's eiders or the threatened southwest Alaska Distinct Population Segment (DPS) of northern sea otters or destroy or adversely modify their critical habitat.

7. In issuing its 404 permitting decision, the Corps failed to meet procedural and substantive legal requirements of the CWA to avoid, minimize, and compensate for impacts of the project on the aquatic environment. 33 U.S.C. §§ 1251–1388. Additionally, the Corps did not undertake an adequate environmental analysis, as required by the National Environmental Policy Act (NEPA), before concluding there would be no significant environmental impact from the road. 42 U.S.C. §§ 4321–4370m. Furthermore, the Corps did not comply with the Alaska National Interest Lands Conservation Act (ANILCA) Title XI, which provides the sole authority for authorizing a road through a refuge in Alaska. 16 U.S.C. §§ 3161–73. And the Service's biological opinion fails to meet the consultation requirements of section 7 of the ESA. 16 U.S.C. §§ 1531–1544.

8. Plaintiffs respectfully request that this Court declare unlawful and vacate: (1) the permit approving the Izembek road project, (2) the Memorandum for Record, and (3) the biological opinion. Plaintiffs further request that this Court enter any and all

injunctive relief necessary to ensure that Defendants comply with the CWA, NEPA, the ESA, ANILCA, and the APA, and to prevent irreparable harm until such compliance occurs.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(c) and (g). There is final agency action subject to judicial review pursuant to 5 U.S.C. § 704. An actual, justiciable controversy exists between Plaintiffs and Defendants. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, 5 U.S.C. §§ 705, 706, and 16 U.S.C. § 1540(g).

10. Venue is appropriate under 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this action occurred in the District of Alaska, and the Izembek Refuge is in Alaska.

## PLAINTIFFS

11. Plaintiff NATIVE VILLAGE OF HOOPER BAY is a federally recognized Tribe located in Alaska's Yukon-Kuskokwim Delta. Native Village of Hooper Bay's Yup'ik citizens harvest several species of geese that migrate through the Izembek Refuge—black brant, emperor geese, and cackling geese—as part of their traditional subsistence way of life.

12. The citizens of the Native Village of Hooper Bay harvest black brant and emperor geese in the spring after they have fattened up in Izembek. They also harvest

black brant, emperor geese, and cackling geese before the birds migrate south to feed in Izembek in the fall. These geese provide critical nutrition in the spring and fall and help the Native Village of Hooper Bay's citizens sustain their connections to the land, each other, and their shared cultural traditions.

13. For example, one citizen of the Native Village of Hooper Bay that harvests geese that feed in Izembek in the spring prefers these geese because they are fattier and more nutritious than birds that do not stop in Izembek. Harvesting the geese helps him and his community recover from the long winters in the spring, and then again at the end of summer the geese help them prepare for the long winter. He plans to continue hunting geese himself and wants future generations to be able to participate in traditional subsistence harvesting of the geese.

14. The harm the road will cause to the geese and their vital wetland habitat in the Izembek Refuge would harm Native Village of Hooper Bay's citizens. Harm to the geese—including poor body condition, diminished reproductive success, and reduced survival rates—would have serious consequences to Native Village of Hooper Bay's citizens' subsistence practices and community.

15. Native Village of Hooper Bay passed a resolution opposing the land exchange and road in May 2022. Native Village of Hooper Bay also actively participated in the Department of Interior's Izembek road process. It submitted scoping comments in May 2024 on the Service's publication of a notice of intent to prepare a supplemental

environmental impact statement (SEIS) for a potential land exchange and road through the Izembek Refuge. It also commented on the draft SEIS in February 2025. Native Village of Hooper Bay also sought cooperating agency status and meaningful consultation with the Service and participated in government-to-government consultations, public meetings, and subsistence hearings following the publication of the draft SEIS. In January 2025, Native Village of Hooper Bay passed an additional resolution raising concerns about the content of the draft SEIS and reaffirming its commitment to opposing a road through the Izembek Refuge and its openness to finding a reasonable compromise to meet the needs of the people of King Cove. In August 2025, when the new administration published a new draft ANILCA section 810 subsistence analysis, Native Village of Hooper Bay commented. It again stressed the importance of Izembek's migratory birds to its subsistence culture and traditions and again asked that the Service consider a marine alternative to protect subsistence. After Interior proceeded with a land exchange for a proposed road in October 2025, Native Village of Hooper Bay filed a lawsuit challenging that decision on November 11, 2025.

16. Native Village of Hooper Bay submitted comments on the Corps' public notice of the 404 permit application in January 2026. Native Village of Hooper Bay also requested and flew to Anchorage for a government-to-government consultation meeting with the Corps on March 5, 2026.

17. Native Village of Hooper Bay is adversely affected by the permit decision.

Its citizens rely on black brant, emperor geese, and cackling geese that will be harmed by the Izembek road. As a result, Native Village of Hooper Bay's citizens' subsistence interests will be harmed, as will their interests in preserving these birds for future generations. Native Village of Hooper Bay's interests in participating in the public process and informing agency decisionmaking are also harmed by Defendants' failure to comply with federal law.

18. Plaintiff NATIVE VILLAGE OF PAIMIUT is a federally recognized Tribe located in Alaska's Yukon-Kuskokwim Delta. Like Native Village of Hooper Bay, Native Village of Paimiut's Yup'ik citizens rely on black brant, emperor geese, and cackling geese for subsistence practices and traditions.

19. For example, one citizen of Native Village of Paimiut that harvests geese that feed in Izembek is a provider for many other families. He usually subsistence hunts for four to six families in the community. He plans to continue hunting geese himself and wants future generations to be able to participate in traditional subsistence harvesting of the geese.

20. Because of the potential harm to the migratory birds on which they rely, in May 2024, Native Village of Paimiut passed a resolution opposing a land exchange and road through Izembek. Native Village of Paimiut also participated in the prior administration's process. In February 2025, Native Village of Paimiut, with other Yukon-Kuskokwim Delta communities, submitted comments on the 2024 draft SEIS and 2024

draft ANILCA section 810 analysis. The comments reiterated the Tribe's opposition to the land exchange and road and requested that they be considered in the Service's ANILCA section 810 analysis. When the current administration published a new draft ANILCA section 810 analysis, Native Village of Paimiut again submitted comments. Native Village of Paimiut also submitted comments on the Corps' public notice of the 404 permit application in January 2026 and requested and flew to Anchorage for a government-to-government consultation meeting with the Corps on March 5, 2026.

21. Native Village of Paimiut is adversely affected by the permit decision. Its citizens rely on black brant, emperor geese, and cackling geese that will be harmed by the Izembek road. As a result, Native Village of Paimiut's citizens' subsistence interests will be harmed, as will their interests in preserving these birds for future generations. Native Village of Paimiut's interests in participating in the public process and informing agency decisionmaking are also harmed by Defendants' failure to comply with federal law.

22. Plaintiff CHEVAK NATIVE VILLAGE is a federally recognized Tribe located in Alaska's Yukon-Kuskokwim Delta. Chevak Native Village's Cup'ik citizens rely on black brant, emperor geese, and cackling geese for their culture and food security. As stated in the Chevak community plan, subsistence practices are "the primary and most necessary form of income and sustenance for virtually every member of the community."

23. For example, one citizen of Chevak Native Village is a subsistence hunter who harvests geese that feed in Izembek to provide for his family and community. He has

observed the landscape and patterns of local wildlife, berries, and other subsistence resources changing due to the changing climate. This makes subsistence practices more difficult than in the past. He plans to continue hunting geese and wants future generations to be able to participate in traditional subsistence harvesting of the geese.

24. Because of the potential harm to the migratory birds on which they rely, in August 2024, Chevak Native Village passed a resolution opposing a land exchange and road through Izembek. Chevak Native Village also participated in the prior administration's process. In February 2025, Chevak Native Village, with other Yukon-Kuskokwim Delta communities, submitted comments on the 2024 draft SEIS and 2024 draft ANILCA section 810 analysis. Their comments reiterated their opposition to the land exchange and road and requested that they be considered in the Service's ANILCA section 810 analysis. When the current administration published a new draft ANILCA section 810 analysis, Chevak Native Village again submitted comments. Chevak Native Village also submitted comments on the Corps' public notice of the 404 permit application in January 2026 and flew to Anchorage for a government-to-government consultation meeting with the Corps on March 5, 2026.

25. Chevak Native Village is adversely affected by the permit decision. Its citizens rely on black brant, emperor geese, and cackling geese that will be harmed by the Izembek road. As a result, Chevak Native Village's citizens' subsistence interests will be harmed, as will their interests in preserving these birds for future generations. Chevak

Native Village's interests in participating in the public process and informing agency decisionmaking are also harmed by Defendants' failure to comply with federal law.

26. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a national, nonprofit organization with offices across the country, including Alaska. The Center has more than 101,000 members. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center brings this action on behalf of its members.

27. The Center's members reside throughout the United States, including Alaska. The Center works to ensure the long-term health and viability of animal and plant communities across the United States and elsewhere, and to protect the habitat these species need to survive. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.

28. The Center's members have a long-standing interest in protecting the Izembek Refuge from a road. These interests include preserving and enjoying the wildlife, habitat, and wilderness values of Izembek for recreational, aesthetic, and environmental protection purposes. The Center's members have visited Izembek, enjoyed viewing its wildlife, and experienced the wilderness and habitat that Izembek provides. The Center's members have strong recreational, aesthetic, scientific, and other interests in the wildlife that uses and depends on Izembek, including migratory birds and terrestrial and marine mammals.

29. For example, one Center member has been visiting the Izembek Refuge since the 1980s. He worked there for many years studying migratory birds and their habitat and fell in love with the Izembek Refuge. Now, even though he no longer works there, he returns again and again for recreational and aesthetic purposes, including boating, wildlife viewing, and berry picking. He plans to go again this fall.

30. Over the years, the Center's members have engaged in many public processes regarding the proposed Izembek road. The Center submitted comments on the Corps' public notice of the 404 permit application in January 2026. The Center has also engaged in lobbying and legislative work to protect its members' interests in Izembek. The interests of the Center's members are harmed by Defendants' failure to comply with federal law.

31. Plaintiffs' actual, concrete injuries are traceable to the Corps' decision to issue the permit and the Service's decision to issue the biological opinion, without adhering to legally required processes and procedures. These injuries would be redressed by the relief sought in this litigation.

**DEFENDANTS**

32. Defendant U.S. ARMY CORPS OF ENGINEERS is a federal agency within the U.S. Department of Defense. The Corps is responsible for reviewing and issuing section 404 permits under the CWA, 33 U.S.C. § 1344. The Corps is required to comply with federal laws, including the CWA, the ESA, NEPA, and the APA. The Corps

issued the permit and Memorandum for Record challenged here.

33. Defendant LIEUTENANT GENERAL WILLIAM H. GRAHAM, Jr., is the Chief of Engineers and Commanding General of the Corps and is sued in his official capacity. Lieutenant Graham is the federal official with the ultimate authority and responsibility for ensuring the Corps' compliance with federal laws, including the CWA, NEPA, ANILCA, and the APA.

34. Defendant COLONEL VICTOR TRUJILLO is the Commander of the Corps' Alaska District and is sued in his official capacity. As district commander, Colonel Trujillo is the Corps official responsible for the permit and Memorandum for Record challenged here.

35. Defendant U.S. FISH AND WILDLIFE SERVICE is an agency within the U.S. Department of the Interior and is responsible for administering the ESA for certain species, including Steller's eiders and sea otters.

36. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior and is being sued in his official capacity. As the Secretary, he is charged with administering and implementing the ESA.

37. Defendant SARA BOARIO is the Alaska Regional Director of the Service and is being sued in her official capacity. She is the responsible official for administering the ESA, including the biological opinion for the permit.

## STATUTORY BACKGROUND

38. To issue the permit, the Corps had to comply with federal laws, including the CWA, NEPA, ANILCA, and the APA. To issue the biological opinion for the permit, the Service also had to comply with federal laws, including the ESA and the APA.

### Clean Water Act

39. The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. *Id.* § 1311(a). Section 404 of the CWA authorizes the Corps to issue permits, after notice and opportunity for public comment, for the discharge of dredge or fill material into waters of the United States. *Id.* § 1344(a).

40. The Environmental Protection Agency has promulgated regulations, known as the "404(b)(1) Guidelines," for section 404 permits. 40 C.F.R. pt. 230. "Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c). "For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines." 33 C.F.R. § 320.4(a)(1).

41. The 404(b)(1) Guidelines require four conditions before the Corps may issue a 404 permit: the proposed project must (1) be the least environmentally damaging practicable alternative; (2) not violate other environmental standards, including the Endangered Species Act; (3) not "cause or contribute to significant degradation of the waters of the United States"; and (4) include all "appropriate and practicable steps" to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(a)–(d). The Corps must deny a 404 permit if "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the[ ]Guidelines." *Id.* § 230.12(a)(3)(iv).

42. Where the proposed project is not water dependent, the 404(b)(1) Guidelines require the Corps to assume that "practicable alternatives that do not involve special aquatic sites are . . . available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). Practicable alternatives are those that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

43. The 404(b)(1) Guidelines require the Corps to fully evaluate all impacts of the proposed activity on the aquatic environment, including (a) physical substrate; (b) water circulation, fluctuation, and salinity; (c) suspended particulate/turbidity; (d) contaminants; (e) aquatic ecosystems and organisms; (f) disposal sites; (g) cumulative effects; and (h) secondary effects. 40 C.F.R. § 230.11. Secondary effects "are effects on

an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." *Id*. § 230.11(h). Thus, secondary effects are not limited in time or space to just the initial discharge but encompass all activities and impacts associated with the fill activities.

44. The Corps must use these factual determinations regarding impacts of the proposed activity to make findings of compliance or non-compliance with the 404(b)(1) Guidelines' prohibitions on discharges that significantly degrade waters of the United States. 40 C.F.R. § 230.10(c). Effects contributing to significant degradation include significantly adverse effects of the discharge of pollutants on (1) human health and welfare, including through effects to wildlife and special aquatic sites; (2) life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including through the transfer of pollutants outside of the disposal site; (3) aquatic ecosystem diversity, productivity, and stability, including through loss of wildlife habitat or loss of wetland capacity; and (4) recreational, aesthetic, and economic values. *Id*.

45. Where impacts to wetlands are unavoidable, the Corps may require compensatory mitigation to ensure compliance with the 404(b)(1) Guidelines. 40 C.F.R. § 230.91(c). The Corps may determine that a permit cannot be issued because of the lack of appropriate and practicable compensatory mitigation options. *Id*.

46. Before issuing a 404 permit, the Corps must also determine that the proposed project is in the public interest, and the "benefits which reasonably may be

expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). The Corps must consider all relevant factors and cumulative effects, including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id*.

**National Environmental Policy Act**

47. NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA does not mandate particular results, but it does prohibit uninformed agency action, directing agencies to (1) take a "hard look" at environmental consequences and (2) "provide for broad dissemination of relevant environmental information" to the public. *Id*. at 350; *see also* 42 U.S.C. § 4332(2)(C). By instructing agencies to analyze the environmental consequences of a proposed action, NEPA's procedures ensure that important effects will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349.

48. NEPA requires agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). Such a statement is required to consider any "reasonably foreseeable environmental effects of the proposed agency action[,]" "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[,]" and "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." *Id.*

49. If a proposed agency action "does not have a reasonably foreseeable significant effect" or if the significance of the effect is unknown, the agency may instead prepare an environmental assessment. 42 U.S.C. § 4336(b)(2).

**Endangered Species Act**

50. Congress enacted the ESA in 1973 "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). Congress's "plain intent" in enacting the ESA "was to halt and reverse the trend toward species extinction, whatever the cost" and "to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–85 (1978).

51. Toward these goals, the ESA directs the Secretary of Interior through the Service and the Secretary of Commerce through the National Marine Fisheries Service (the wildlife agencies), as appropriate, to determine which species of plants and animals are "threatened" and "endangered" and place them on a list of protected species. 16

U.S.C. § 1533. The Service is the wildlife agency responsible for administering the ESA for northern sea otters and Steller's eiders. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

52. The ESA seeks "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." 16 U.S.C. § 1531(b). The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3). Accordingly, the ultimate goal of the ESA is not only to prevent listed species from going extinct, but also to recover these species to the point where they no longer require ESA protection.

53. Once a species is listed, the ESA provides an array of procedural and substantive protections not provided by any other law. These protections include designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. 16 U.S.C. §§ 1533(a)(3), (f), 1538, 1536. Section 9 of the ESA prohibits any person from "taking" an endangered species without proper authorization. *Id*. § 1538(a)(1)(B). The term "take" is statutorily defined broadly as "to harass, harm,

pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Take" includes both direct and indirect harm and it need not be purposeful. The take prohibition applies to any "person," *id*. § 1538(a)(1), including federal agencies, *id*. § 1532(13). The ESA further makes it unlawful for any person, including federal agencies and/or federal officials acting in their official capacity, to "cause to be committed" the take of a listed species. *Id*. § 1538(g).

54. Section 7(a)(2) of the ESA contains the substantive requirement that all federal agencies ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [their designated critical] habitat." 16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence" means "to engage in an action that reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

55. To comply with section 7's substantive mandate, federal agencies must consult with the relevant wildlife agency whenever their actions may affect a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Agency action is defined to include "*any* action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2) (emphasis added); *see also* 50 C.F.R. § 402.03. This includes the granting of permits. 50 C.F.R. § 402.02. The "may affect" standard includes "[*a*]*ny possible effect*,

whether beneficial, benign, adverse or of an undetermined character." *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) (citation omitted). In meeting the requirements of section 7, both the action and wildlife agency must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (f), (g)(8).

56. During consultation, the wildlife agency must consider (1) the aggregate effect of past and ongoing human activities that affect the current status of the species and its habitat ("environmental baseline"); (2) all consequences of the proposed action, including those that occur later in time ("effects of the action"); and (3) the effects of future state and private activities that are reasonably certain to occur ("cumulative effects"). 50 C.F.R. §§ 402.14(g), 402.02. The wildlife agency must consider all these factors in the context of the current status of the species and its habitat. *Id.* § 402.14(g).

57. To complete formal consultation, the wildlife agency must issue a "biological opinion" that explains how a proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (h). The biological opinion includes a determination from the wildlife agency on whether a proposed action is "likely to jeopardize" or "not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h). The ESA's implementing regulations define "[j]eopardize the continued existence of" as "an action that reasonably would be expected, directly or indirectly, to

reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* § 402.02. If the wildlife agency concludes a proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives" to avoid jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

58. If the wildlife agency concludes that an action is reasonably certain to take listed members of the population but will not jeopardize the continued existence of the species, the biological opinion must include an incidental take statement (ITS) that specifies the impact of the action, generally by setting a numeric limit on take and identifying "reasonable and prudent measures" that will minimize the impact of that take, among other requirements. 16 U.S.C. § 1536(b)(4)(C). In addition, when take of endangered or threatened marine mammals is involved, the take must first be authorized pursuant to the Marine Mammal Protection Act, and the ITS must include any additional measures necessary to comply with the Marine Mammal Protection Act take authorization. *Id.* § 1543; 50 C.F.R. § 402.14(i)(1). The take of a listed species in compliance with the terms of a valid ITS is not prohibited under section 9 of the ESA. 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(6).

59. The ESA also directs all federal agencies to utilize their authorities to carry

out "programs for the conservation of endangered and threatened species." 16 U.S.C. § 1536(a)(1).

60. The adequacy of the wildlife agency's biological opinion is reviewed under the APA. 5 U.S.C. §§ 702–06.

61. Regardless of the conclusion reached in the biological opinion, the agency undertaking the federal action has an independent duty to ensure that its actions are not likely to jeopardize the continued existence of listed species. 16 U.S.C. § 1536(a)(2). An agency's reliance on a legally flawed biological opinion to authorize an action does not satisfy its substantive duty to ensure against jeopardy or adverse modification of critical habitat.

62. A claim against an action agency for violating its substantive obligation to ensure its actions are not likely to jeopardize listed species or adversely modify critical habitat by relying on an unlawful biological opinion arises under the ESA's citizen suit provision. *Id*. § 1540(g).

**Alaska National Interest Lands Conservation Act**

63. Congress enacted ANILCA in 1980 "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so," 16 U.S.C. § 3101(c), and to preserve and maintain scenic Alaskan lands, wildlife species, and undisturbed ecosystems, *see id*. § 3101(b). In carrying out ANILCA's conservation purpose, Congress reclassified more than 104 million acres of lands within Alaska into new or expanded

parks, refuges, and other conservation areas, *see id.* §§ 3101–3233, known as conservation system units, *id.* § 3102(4).

64. Congress also included an entire chapter, Title XI, 16 U.S.C. §§ 3161–73, outlining "a single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through conservation system units, *id*. § 3161(c), including roads, *id*. § 3162(4)(B)(vii). Congress found that the Title XI process was necessary "to minimize the adverse impacts of siting transportation and utility systems within [conservation system] units established or expanded by [ANILCA] and to insure the effectiveness of the decisionmaking process." *Id*. § 3161(c). Title XI mandates that

> Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with.

*Id*. § 3164(a).

65. Section 1104 of Title XI imposes a specific process and required findings that must be met prior to any approval of a transportation system. 16 U.S.C. § 3164. Section 1104 requires the preparation of an EIS; additional opportunities for involvement by stakeholders, governmental entities, ANCSA corporations, and the public; and eight detailed findings supported by substantial evidence. *Id.* § 3164(e)–(g). Further, section 1106 imposes additional requirements that must be met prior to any approval of a transportation system in congressionally designated wilderness areas, including a

recommendation by the President and approval by Congress. *Id*. § 3166(b), (c).

### Administrative Procedure Act

66. The APA grants a right of federal judicial review to any person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

67. The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## STATEMENT OF FACTS

### The Izembek Refuge

68. The Izembek Refuge is located at the end of the Alaska Peninsula in Southwest Alaska, between the Bering Sea and the Gulf of Alaska. The area has been stewarded for thousands of years by the Unangan people.

69. The Izembek Refuge has enormous ecological value. Its lagoons host extensive tidal marshes and eelgrass beds that provide the foundational habitat structure for a rich and diverse array of invertebrates, fish, birds, and mammals. Its tidal marshes and seagrasses, including eelgrass, are among the most productive ecosystems in the world and offer a powerful natural form of carbon sequestration. They also nurture the black brant, emperor geese, and cackling geese on which Native Villages rely, as well as

other fish and wildlife species, including ESA-listed Steller's eiders and northern sea otters.

70. The U.S. government recognized the specialness of the area and its importance for waterfowl, brown bears, caribou, and other wildlife when it established the Izembek National Wildlife Range in 1960. 25 Fed. Reg. 12,599, 12,600 (Dec. 9, 1960). Congress redesignated the area as the Izembek National Wildlife Refuge when it enacted ANILCA in 1980 and designated approximately 307,982 acres of the 315,000-acre Refuge as Wilderness.

71. The Izembek Refuge features a narrow isthmus between Izembek Lagoon to the north and Kinzarof Lagoon and Cold Bay to the south. The Izembek and Kinzarof lagoons and adjacent areas of the Izembek Refuge support hundreds of thousands of waterbirds during their long-distance migrations between breeding and wintering areas.

72. Nearly the entire population of black brant, most of the population of cackling geese, and significant numbers of emperor geese rely on the rich eelgrass beds of Izembek to fuel their migrations. Recently, large numbers of black brant have begun overwintering in Izembek. While in the Izembek Refuge, brant, emperor geese, and cackling geese build fat reserves necessary for significant events in their life cycles, such as migration, nesting, and preparing for the winter season.

73. These geese tie the Native Villages, and many other communities in the Yukon-Kuskokwim Delta, to the Izembek Refuge. Black brant and emperor geese stop in

Izembek in the spring before continuing their journey north to the Yukon-Kuskokwim Delta, where Native Villages' citizens harvest them for subsistence. These geese are a crucial component of Native Villages' subsistence culture and traditional practices. At the end of Alaska's long winters, the geese are among the first species to return, offering rich, fatty meat that provides essential nutrition and energy. They go back through Izembek Refuge in the fall, along with cackling geese, another important subsistence species for Native Villages' citizens. Citizens of Native Villages also harvest geese as they migrate back to Izembek, including black brant, emperor geese, and cackling geese. While cackling geese have a dispersed migratory route in the spring, most of their population stops to feed in Izembek in the fall. At times, these three species of geese make up most of citizens' subsistence diets and are one of only a few things available to eat. Subsistence harvest of the geese is integral to Native Villages' way of life and shapes the cultural identity of their communities. Subsistence foods like the geese are also critical for food security because of the high cost of store-bought food, inflationary effects, and inconsistency in availability of groceries from a grocery store. The Yukon-Kuskokwim Delta has the highest food insecurity rates in the state.

74. These geese also play a key role in maintaining healthy ecosystems in the Yukon-Kuskokwim Delta. Large numbers of geese nesting in the Yukon-Kuskokwim Delta maintain grazing lawns, keeping their forage plants at the optimum level to retain high nutrient content for their young. If the number of geese nesting in the Yukon-

Kuskokwim Delta decreases and the forage plants grow past their optimum level, it will take more than a decade for the forage plants to recover, affecting gosling survival and reproductive success in the meantime.

75. The Alaska-breeding population of Steller's eiders—a migratory sea duck that spends the majority of its life, outside of nesting, in the marine environment—also relies on Izembek and Kinzarof lagoons and adjacent areas of the Izembek Refuge. An estimated 12 to 15 percent of listed Steller's eiders molt in Izembek, approximately 50 percent overwinter there, and as much as 93 percent of the population relies on Izembek during spring migration staging. Izembek is one of the few places in the species' range where Steller's eiders congregate in large numbers.

76. The Alaska-breeding population of Steller's eiders has been listed as threatened under the ESA since 1997. Today the Alaska-breeding population of Steller's eiders is estimated to be 406 individuals. The listed population's low numbers and restricted breeding range make it vulnerable to many threats, and the Service has recognized that the mortality of only a few breeding adults could lower the resiliency of the entire population.

77. Steller's eiders begin arriving in Izembek and other molting sites on the Alaska Peninsula in late August. There, they begin a molting period, losing all feathers, which renders them flightless and with impaired diving abilities for approximately a month. During this impaired molting period, Steller's eiders prefer shallow, protected

areas, like Izembek Lagoon, where eelgrass beds and intertidal mudflats provide relatively easy access to prey, primarily protein-rich marine invertebrates. Following the completion of their molt, Steller's eiders begin a wintering period, where some disperse and others remain in their molting lagoons. Pair bonding and courtship behavior begin in late winter and are completed prior to departure to breeding grounds in April.

78. The Service designated critical habitat for Alaska-breeding Steller's eiders in 2001, including all of Izembek Lagoon. Izembek Lagoon is considered essential to the eiders' recovery because it hosts large numbers of eiders during the fall through spring months. It is also considered critical because eiders are especially vulnerable to disturbance and contamination due to flightlessness while molting there. During the fall molt and staging, as well as staging during spring migration, large numbers of Steller's eiders (both the Alaska-breeding population and the non-listed Pacific Russia-breeding population) frequent Izembek and Kinzarof lagoons. The eiders feed on marine invertebrates in the expansive eelgrass beds in both lagoons. The eiders fly over the Izembek Refuge's narrow isthmus, between Izembek Lagoon and Kinzarof Lagoon.

79. Adequate invertebrate food sources are crucial for eiders to meet their high nutrient acquisition and energetic requirements during molt, wintering, migration, and staging periods. If the eiders are unable to meet their nutrient requirements, their body condition may decrease, lowering survival probability, reducing breeding propensity, and/or causing nest abandonment. Damage to Izembek's eelgrass beds, and therefore the

availability and quality of food resources in the non-breeding areas, would have serious negative implications for eiders' ability to survive the winter and reproduce the following season. Populations of marine invertebrates in Izembek Lagoon have already declined due to the changing climate. Recent studies have shown significantly reduced biomass and mean size of benthic invertebrates since 1998, likely due to warming seas and reduced winter sea ice covering the Lagoon. Climate projections show that the marine invertebrate food sources eiders rely on will continue to decline in some areas, including Izembek Lagoon.

80. Stressors to Steller's eiders include shooting, human disturbance, construction of new infrastructure, habitat loss, and collisions. Steller's eiders' eelgrass habitat has declined by 10 square miles between 2006 and 2020. Other changes to the eiders' habitat include melting permafrost in Arctic breeding grounds and changes in the marine environment caused by climate change. The Service further predicts that the cumulative and/or synergistic effects of habitat changes and current and future stressors are likely to negatively affect the population to the point where it will be in danger of extirpation in the foreseeable future.

81. The southwest Alaska DPS of northern sea otters was listed as threatened under the ESA in 2005. The sea otters appear year-round in marine waters adjacent to the Izembek Refuge, and the species has designated critical habitat in the Izembek and

Kinzarof lagoons as well as Cold Bay. Sea otters have also been observed crossing the isthmus between Izembek and Kinzarof lagoons.

82. Northern sea otters forage almost exclusively on bottom-dwelling marine invertebrates that rely on an abundance of eelgrass beds for their survival. As climate change is causing a global decline in sea otter habitat like kelp forests and seagrass meadows, the importance of the Izembek Refuge eelgrass beds has grown. Warming oceans also promote harmful algae blooms and increase the spread and abundance of pathogens that harm sea otters.

83. Stressors to northern sea otters include warming oceans and ocean acidification due to climate change; oil spills and other contamination resulting from increasing ship traffic; oil and gas activities; subsistence harvest; diseases; and killer whale predation.

84. The Marine Mammal Protection Act prohibits hunting of northern sea otters, 16 U.S.C. § 1371(a), with the exception of harvest for subsistence purposes by Alaska Natives who dwell along the coast, *id.* § 1371(b). Current subsistence harvest numbers for the southwest Alaska DPS of northern sea otter are considered sustainable, with negligible population level impacts.

**The Izembek Road**

85. In October 2025, during the government shutdown, the Secretary of Interior signed a land exchange agreement with KCC and transferred a patent for 484 acres of

land within the Izembek Refuge to KCC in exchange for approximately 1,739 acres of KCC surface lands within the boundaries of the refuge. The decision document for the land exchange made clear that the purpose of the exchange was to facilitate a road through the Izembek Refuge. Interior did not complete an ANILCA Title XI process for the land exchange.

86. Three cases challenging the Izembek land exchange decision are currently pending in the U.S. District Court for the District of Alaska: *Native Village of Hooper Bay v. Burgum*, 3:25-cv-00316; *Friends of Alaska National Wildlife Refuges v. Burgum*, 3:25-cv-00318; and *Defenders of Wildlife v. Burgum*, 3:25-cv-00319.

87. The government has long studied the likely impacts of a road on the Izembek Refuge and the species that rely on it. The Corps as well as Interior and the Service have repeatedly found that a road would have negative effects on the Izembek Refuge's environment, wildlife, and subsistence uses. The Corps and Interior have also both concluded that a road through the Izembek Refuge would require congressional approval under ANILCA Title XI.

88. In a 2003 NEPA process, the Corps concluded that the impact of a road through Izembek would span well beyond the road corridor and would significantly degrade wildlife and wilderness.

89. A road and its construction, operation, maintenance, and anticipated increase in off-road vehicle (ORV) activity and visitation to the Izembek Refuge would

perpetually damage its rich ecosystems and the many species that rely on Izembek for their survival, including black brant, emperor geese, cackling geese, Steller's eiders, and northern sea otters. A road would damage crucial feeding habitat, disrupt movements, and have significant negative population-level effects on the geese, as well as other species the Izembek Refuge was established to protect. A road would bisect a section of the Izembek Refuge that is an important corridor for geese, Steller's eiders, and sea otters traveling between marine feeding grounds in Izembek and Kinzarof lagoons. Much of the habitat in the road corridor is upland tundra that is dominated by crowberry vegetation, which provides important fall forage for cackling geese, emperor geese, shorebirds, and brown bears. Vehicle traffic on a road would displace wildlife from crowberry feeding areas. Geese have been observed to use crowberry habitats less near roads.

90. The habitat damage caused by soil removal, excavation, gravel mining, airborne dust, introduction of invasives, grading, snowplowing, anti-icing, and dust suppressants during construction, maintenance, and use of the proposed road would not be confined to the road itself but would encompass a much wider area. Damage would include long-term changes in hydrology, snow patterns, soil characteristics, and ecosystem processes.

91. There would also be additional damage from increased ORV use that the road would facilitate. Since construction of the King Cove Access Road along the shore of Cold Bay to the boundary of the Izembek Refuge, ORV use and its attendant harms

have increased. Habitat destruction by ORV travel over tundra is generally severe and long-lasting in this region of Alaska. Thus, an additional 18.9 miles of road would lead to major habitat destruction, including loss of critical breeding and feeding sites, and wildlife harassment over a much wider area than the road corridor.

92. The Service predicts that a road would lead to an increase in harvest of black brant, emperor geese, and cackling geese in the Izembek Refuge. Brant and emperor geese are especially vulnerable to overharvest in the spring because significant proportions of their overall breeding populations are concentrated in the Izembek Refuge to fatten up prior to migration to nesting grounds in the Yukon-Kuskokwim Delta and elsewhere. Overall population sizes of these goose species are in decline, with black brant declining by 30 percent, cackling geese by 25 percent, and emperor geese by 7 percent. A road would provide increased access to Izembek and Kinzarof lagoons, which would put these geese at greater risk of population declines given their population-level dependence on the Izembek Refuge.

93. Black brant and Steller's eiders are particularly susceptible to adverse effects of human disturbances. Motorized boats, ORV activity, and hunting are highly disturbing to both species. Disturbances cause harm through increased energy expenditure, reduced feeding, and displacement from preferred foraging areas. Scientists have found that any increases in current rates of disturbance could lower the number of black brant migrating in spring and breeding successfully. This is because black brant

already spend all or nearly all their time feeding in winter and spring and therefore are unable to compensate for lost foraging opportunities and increased energy expenditure by increasing rates of food intake.

94. Analyses of road impacts have concluded that a road through Izembek Refuge could displace Steller's eiders from areas of Izembek Lagoon and Kinzarof Lagoon. Increased foot, boat, and ORV traffic resulting from the road would likely lead to disturbance to eiders, particularly during flightless molting periods. Disturbed eiders would likely leave preferred feeding areas, expending energy and decreasing their ability to recover from molting. Steller's eiders are especially vulnerable when molting due to their flightless state. Disturbed eiders expend energy, which decreases their ability to recover from molting and displaces them from preferred feeding areas. Studies have shown that eiders that molt at Izembek Lagoon have a high degree of fidelity to that specific lagoon. This tendency to return to a habitat area, even if it becomes an area of high disturbance, can lead to declines in both overall population productivity and fitness of individual members of the species. Steller's eiders could also suffer direct injury or mortality if they collide with a water vessel while in Izembek or Kinzarof lagoons or are struck by a vehicle while flying across the isthmus between the lagoons. Steller's eiders may also be accidentally shot by hunters seeking to harvest other migratory birds.

95. Studies have also found that Izembek Lagoon is an area of high sea otter concentration and that development in the Izembek area, including construction and

higher vessel traffic resulting in increased noise and visual disturbances, may disturb otters and reduce valuable feeding time. Sea otters are also vulnerable to being struck by water vessels. Sea otters have also been observed crossing the isthmus between Izembek and Kinzarof lagoons; if a road is built through the isthmus as proposed, sea otters would be vulnerable to being hit by passing vehicles. Increased access to the area by waterfowl hunters due to the road could also disturb sea otters.

96. The Southern Alaska Peninsula caribou herd relies on the narrow isthmus between Izembek and Kinzarof lagoons as an important migration corridor between calving grounds and wintering areas. A road bisecting the isthmus could cause caribou to abandon the corridor, which could have long-term adverse effects. For those caribou that continue to utilize the isthmus for migration, their movements will be restricted to a narrow corridor, where they will be vulnerable to overharvest.

97. A road would jeopardize the integrity of the entire eelgrass ecosystem that supports most of the fish and wildlife species in the Izembek Refuge, including geese, Steller's eiders, and northern sea otters. Climate change is causing a decline in populations of marine invertebrates that live in the eelgrass of Izembek and Kinzarof lagoons and provide a primary food source for brant, emperor geese, Steller's eiders, northern sea otters, and other wildlife. Changes in hydrology and water quality from a road would harm the eelgrass meadows by altering water clarity, salinity levels, sediment transport, and light availability, potentially leading to reduced eelgrass abundance and

distribution, and thereby degrading the entire food web that it supports.

98. The Corps and Interior have both previously determined that there are practicable alternatives that can provide cost-effective, safe, and reliable transportation between King Cove and Cold Bay. For example, in 2003, the Corps concluded that the environmentally preferable practicable alternatives to a road were two marine options: a hovercraft from the Northeast Terminal and a ferry from Cold Bay to Lenard Harbor. The Corps also found that a road through Izembek would not qualify as an environmentally preferable alternative. In 2015, the Corps developed a report summarizing the economic and technical feasibility of non-road alternatives, including a number of marine ferry routes as well as airport and helicopter options. The Corps found that a ferry option was technically feasible, 99.9 percent reliable, and cost-competitive.

**The Permit Decision**

99. On December 12, 2025, the Corps issued a public notice for a CWA 404 permit application, submitted by ADOT, to construct a road through Izembek, connecting King Cove to Cold Bay. The public notice was five pages, followed by maps showing the proposed road route and road segments relative to mapped wetlands, as well as a figure depicting a typical road section and a bridge section. The public notice opened a 30-day public comment period, which ended on January 12, 2026. Native Villages requested an extension to February 11, citing the multiple holidays that would fall during the comment period and the importance of the issue because of the impacts a road would have on the

migratory birds they rely on for subsistence. The Corps initially granted the extension and later revoked it.

100. The Corps received more than 1,200 comments on the public notice. Commenters raised, among other issues, (1) the unlawful land exchange and ongoing litigation challenging Interior's land exchange decision; (2) the lack of a Title XI process for the road; (3) the existence of less environmentally damaging practicable alternatives to the road, including the marine ferry alternative; (4) the irreversible damage the road would cause to Izembek Refuge's special aquatic sites, wetlands, wildlife (including migratory birds and ESA-listed species and their critical habitats), and wilderness values; (5) the requirement to prepare an EIS due to the significant adverse impacts of a road; (6) the lack of sufficient information to meaningfully comment; and (7) that the purpose of the project was too narrow.

101. Native Villages commented and requested a government-to-government consultation meeting with the Corps. Native Villages' comments raised, among other issues, the impacts to migratory birds from a road and how those impacts would affect their communities because of their traditional harvest of the black brant, emperor geese, and cackling geese.

102. On March 5, 2026, representatives from Native Villages flew to Anchorage, Alaska, to engage in government-to-government consultation with Corps officials regarding the permit. Among those in attendance were members of Native Village of

Hooper Bay's Tribal Council; Native Village of Paimiut's President and Vice President; and Chevak Native Village's Second Chief and a member of its Traditional Council. These representatives from Native Villages told Corps officials about their use and stewardship of the migratory birds that rely on Izembek and about how subsistence is their way of life. They described how subsistence is not just essential for their nutrition, but also to their psychological and emotional well-being. They described how climate change has already made life harder in many ways, including making subsistence harvest more difficult. They urged the Corps to pursue a marine alternative to solve King Cove's transportation problems without harming the migratory birds. During the consultation, the Corps committed to considering a marine alternative.

103. On July 9, 2026, the Corps issued to ADOT a permit authorizing construction of an 18.9 single-lane unpaved road, owned by KCC, connecting King Cove to Cold Bay through Izembek. The Corps also issued a Memorandum for Record for the permit, consisting of a combined Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings.

104. The proposed road would be sited within the corridor of land that was transferred to KCC in the land exchange. The proposed road would be 13 feet wide at the surface and 24 feet wide at the subgrade with 113 vehicle turnout spaces, approximately 85 drainage culverts, and one bridge. The proposed road would cross 23 perennial streams and 62 drainages with ephemeral, intermittent, or seasonal flow.

105. The permit authorized discharge of 40,000 cubic yards of gravel and riprap fill material into 5.28 acres of waters of the United States, comprised of 4.58 acres of palustrine scrub-shrub and emergent freshwater wetlands and 0.70 acres of stream channels. It also authorizes mechanical clearing of wetlands and other waters to construct the road.

106. Gravel and other rock material for road construction would be obtained from two dedicated material sites in uplands and from 14 other upland locations along the road corridor. In total, about 1.7 million cubic yards of material would be moved during cut and fill activities, of which 1.2 million cubic yards of crushed rock would be used for road construction and an additional 10,150 cubic yards of crushed rock would be used as riprap.

107. The total road construction footprint, including material sites, would be 186 acres. Construction would occur over at least three years, potentially occurring year-round, but likely between May and November.

108. The Corps determined that an environmental assessment, rather than an EIS, was sufficient under NEPA because, while the project would adversely impact wetlands and other waters of the United States, the Corps believed that the road design, siting, and mitigation measures would prevent significant impact to the environment. The Corps determined that the scope of its NEPA analysis was activity within the proposed 490-acre road right-of-way where the road and material sites would be located. The

Corps included upland components that included the road footprint, material sites, and staging and turnout areas falling within this 490-acre road right-of-way.

109. The Corps determined that the project was not water dependent because the basic project purpose is public transportation, which does not require siting within a special aquatic site. The Corps accepted the overall project purpose defined by ADOT, which was to provide the residents and businesses of the community of King Cove with safe, reliable, and affordable year-round surface transportation to the State of Alaska's all-weather airport at Cold Bay.

110. The Corps analyzed a no action alternative, the preferred road alternative, and a second road alternative comprised of a 20-mile road through the Izembek Refuge along a northern route closer to Izembek Lagoon. The Corps did not analyze marine alternatives, including a hovercraft, ferry, or landing craft. The Corps stated that those alternatives would not meet the applicant's needs.

111. ADOT prepared an Environmental Document and Alternatives Analysis that the Corps relied on. Neither document was made available to the public during the comment period. The Corps relied on the Alternatives Analysis to conclude that the preferred road alternative was the least environmentally damaging, practicable alternative. The Corps determined that while both routes would cross similar habitat and freshwater wetlands, the northern route would be closer to and within drainages that flow into Izembek Lagoon. The Corps also determined that the northern route was not

immediately available because it is largely in federally designated wilderness and would require a land transfer or possibly congressional approval.

112. The proposed road would be located within the Kinzarof Lagoon watershed. The Corps assumed that some streams within the road corridor flow south into Kinzarof Lagoon. The Corps did not consider impacts to groundwater, despite the Service concluding in the biological opinion that "[d]isruption of surface water flow in uplands would impact both surface and subsurface flows, with the latter being an equally important component of wetland hydrology because groundwater may be the primary source of water in a lowland wetland." Wetlands that have a hydrologic connection to Kinzarof Lagoon would be filled and directly impacted by the activities authorized in the permit. The Corps dismissed direct impacts from filling these wetlands as small because it determined that the total cumulative disturbance for the road, including material sites, would be approximately 0.699 percent of the Kinzarof Lagoon watershed. The Corps determined that direct impacts to the highly valued and important eelgrass bed and lagoon vegetation would be avoided because the road will be located at least one-half mile from the Kinzarof and Izembek lagoons.

113. The Corps stated that the proposed road would avoid the Izembek Lagoon watershed. The Corps concluded that Izembek Lagoon's eelgrass beds and migratory bird habitats were more valuable than those in Kinzarof Lagoon.

114. The Corps found that an unpaved, gravel road could cause indirect effects, including increased erosion and sedimentation to downstream waters in lagoons containing eelgrass. However, the Corps determined that any potential indirect effects to eelgrass would be local and minor. This determination relied on mitigation measures and the assumption that best management practices would be used during construction to limit erosion and sedimentation.

115. The permit only requires erosion control measures along the perimeter of work areas during construction activity. It does not dictate any specific measures or specify what best management practices are required.

116. The permit requires that disturbed areas be stabilized immediately after construction to prevent soil erosion. The permit requires the use of sod, degradable mats, barriers, or a combination of similar stabilizing materials to prevent erosion. However, the Corps did not discuss or analyze the effectiveness of these erosion control measures, especially in the harsh environmental conditions present along the road corridor.

117. The Corps also determined the proposed road may increase ORV use and that this expanded ORV use would impact wetlands and water courses with soil compaction, erosion, and sedimentation. The Corps did not analyze how this increase in ORV use would impact waters of the United States. The Corps reasoned that since ORV use is generally prohibited on the surrounding federally designated wilderness lands, the

impacts from increased ORV use would be mitigated by posting signs to discourage ORV use.

118. In a 2013 Record of Decision, former Secretary of the Interior Sally Jewell determined that damage and impacts from ORV use could not be prevented through regulation, enforcement, or roadside barriers. Interior's 2024 draft Supplemental Environment Impact Statement (DSEIS) for a land exchange for a road through Izembek showed that after a road was built from Lenard Harbor to a hovercraft terminal near the boundary of Izembek Wilderness, there was an 800 percent increase in ORV trails within Izembek, which has resulted in degradation of tundra habitat.

119. ADOT purportedly prepared a document entitled "DOT Rebuttal to FWS analysis of ORV trails with aerial imagery" that the Corps relied on. That document was not available to the public during the public comment period.

120. The initial CWA 401 water quality certification issued by the Alaska Department of Environmental Conservation included a condition that required barriers along the length of the proposed road to reduce unauthorized ORV use. That condition was removed after ADOT objected.

121. The Corps determined that construction activity and the presence of the proposed road could alter water flow patterns, i.e., the hydrologic wetland connectivity and function within the Kinzarof Lagoon watershed. The Corps determined that these water flow impacts could be mitigated by installing culverts that would maintain natural

drainage patterns. While the specific location of these culverts would be determined in the field, they are supposed to be installed in sufficient number and size to prevent ponding, dewatering, water diversion between watersheds, or concentrating runoff flows and to ensure that hydrology is not altered. The Corps did not discuss or identify specific requirements for the culverts that would be necessary to ensure the hydrology of the area is not impacted.

122. The Corps did not discuss any long-term impacts from the culverts themselves. Nor is there any discussion about rate of failure for culverts or the impact of culvert failure on waters of the United States. The permit only requires a culvert monitoring report for three summer seasons following completion of construction. There is no long-term requirement to monitor the 85 culverts that would be installed along the road.

123. Approximately 186 acres of native soil substrate would be disturbed to build the roadbed. The Corps determined that due to the history of military use in the area, unexploded ordinance, military munitions, and contaminated soils may be present. The Corps also recognized that Izembek has been the location of several contaminant remediation actions administered by the Corps' Formerly Used Defense Sites program. The permit requires that all fill material must be clean, contaminant-free soil. The Corps concluded that testing of the soil is not required because the proposed material is unlikely to be a carrier of containments.

124. The Corps engaged in very little discussion about the impacts associated with operation of the road. With respect to any impacts discussed, the Corps determined those impacts would be minimal because of the low traffic volume (about 45 vehicles per day) and the small project footprint.

125. The Corps identified that windy and rainy conditions persist year-round in the road corridor. Yet there is no discussion about the impacts to wetlands from road runoff.

126. The Corps determined that compensatory mitigation to offset the environmental loss from the unavoidable impacts to waters of the United States from the construction of the road was not required. ADOT had proposed that the 1,739 acres of KCC lands transferred to the United States as part of the 2025 Exchange Agreement be considered as compensatory mitigation for the unavoidable loss of wetlands caused by the proposed project. The Corps determined this proposed mitigation would not be appropriate for compensatory mitigation. The Corps still relied on those lands as a basis to find compensatory mitigation was not required for the project.

127. The Corps determined that the project is not contrary to the public interest. The Corps assumed that mitigation measures would successfully preserve Izembek's conservation values. The Corps' public interest determination did not consider Native Villages and only found that there would be subsistence benefits from the road.

128. The Corps concluded that the proposed road would not have unacceptable adverse impact on the ecosystem or contribute to the significant degradation of valuable waters, wetlands, fish, or wildlife based on the project's design and mitigation measures.

129. The Corps did not follow the procedures under ANILCA Title XI prior to issuing the permit.

**The Biological Opinion**

130. The Corps engaged in consultation with the Service under section 7 of the ESA regarding impacts to the threatened Alaska-breeding population of Steller's eiders and the threatened southwest Alaska DPS of northern sea otters and their designated critical habitat.

131. The Service had previously completed formal consultation under section 7 and issued a biological opinion in October 2025 for the land exchange decision. On April 1, 2026, the Service issued an errata seeking to address significant errors in the biological opinion that affected how the agency calculated the amount of current and future disturbance that may occur in Izembek Lagoon.

132. On June 18, 2026, the Service issued a biological opinion on the Corps' permit, again evaluating the road's effects on the threatened Alaska-breeding population of Steller's eider, the threatened southwest Alaska Distinct Population Segment of northern sea otters, and designated critical habitat for both species.

133. The biological opinion analyzes a 53-year action consisting of a three-year construction window followed by a 50-year operational life of the road. The biological opinion considers and analyzes the same road proposal that it considered and analyzed in its 2025 biological opinion for the land exchange.

134. The Service concluded that the project is not likely to jeopardize the continued existence of either species and is not likely to destroy or adversely modify the designated critical habitat of either species.

135. The Service expressly premised these conclusions on the assumption that the project will be carried out with full implementation of the conservation measures incorporated into its design.

136. The biological opinion finds that a road through the ecologically important and sensitive wetlands would permanently change the landscape and adversely affect Steller's eiders over the life of the road.

137. The biological opinion identifies the following project activities as sources of adverse effects to Steller's eiders: (a) increased disturbance from hunting and boating activity in Izembek Lagoon facilitated by the road; (b) increased inadvertent harvest of eiders during otherwise-lawful waterfowl hunting; (c) increased collision risk with vessels; (d) collision risk with temporary vertical structures and increased noise during the three-year construction period; and (e) degradation of the habitat on which eiders rely for feeding and resting.

138. The biological opinion finds that Steller's eiders are present in Izembek in large and biologically significant numbers: an estimated 12 to 15 percent of the listed population during the fall molt, up to 52 percent by February during the overwintering period, and between 50 and 93 percent during spring migration staging.

139. With respect to designated critical habitat, the biological opinion finds that construction of the road would permanently alter local hydrology, modifying input into Izembek Lagoon and affecting the associated primary constituent elements, which include eelgrass, marine waters and benthic substrates, and macroinvertebrate prey species.

140. The biological opinion finds that these effects would be additive to existing stressors that have already caused a measurable loss of eelgrass habitat and a measurable reduction in the overall biomass of certain invertebrate prey species on which eiders rely. The Service nevertheless concluded that the road's effects would reach only a relatively small portion of eiders' critical habitat and therefore would not appreciably diminish its value for the conservation of the species.

141. The biological opinion estimates that a total of 12 Alaska-breeding Steller's eiders would be killed over the 53-year action: one eider killed by collision with a temporary vertical structure during construction, six eiders killed by vessel collision over the road's 50-year operational life, and five eiders killed through increased inadvertent harvest over that same period.

142. The biological opinion characterizes this mortality as a loss of 0.23 eiders per year from the listed population, which the Service estimated at 406 birds, or less than one percent of the population per year.

143. For vessel collisions, the biological opinion estimates the maximum mortality rate as one eider every 8.33 years, or six eiders over the 50-year lifetime of the road.

144. For inadvertent harvest, the biological opinion estimates that the road would increase the harvest rate from one every 38.5 years to one every 10 years, resulting in take of five eiders over the 50-year life of the road.

145. The biological opinion also finds that the road would subject eiders to chronic disturbance, estimating that eiders would spend between 5.19 and 15.08 percent of their daytime hourly budget responding to hunting and boating disturbance after the road is constructed, a 2.53- to 2.94-fold increase over baseline conditions.

146. The Service acknowledged that this level of disturbance would exceed the threshold that its own best available science—a brant disturbance model—identifies as reducing survival. The Service estimated that the project would lead to an approximate 7.62- to 8.82-fold increase above the rates used to model disturbance to brant, exceeding the model's no-effect ceiling of a 5-fold increase. The Service accordingly acknowledged that it expects the project would affect the survival and emigration of some brant (and eiders by proxy) and thereby lower the numbers of the listed entity.

147. In its 2025 biological opinion, the Service stated that there is no evidence Steller's eiders can accommodate disturbance that causes more than a 12.2 percent change in normal behaviors. The 2025 biological opinion thus identified a 12.2 percent change in normal behavior as the outer limit of what eiders could withstand. The 2026 biological opinion relies on the same study that uses the 12.2 percent figure. But the 2026 biological opinion omits the statement that there is no evidence eiders can accommodate changes in normal behavior greater than 12.2 percent and, instead, recasts the same study as indicating that eiders may have some flexibility to adjust their time budgets, move to alternate feeding grounds, or shift spatiotemporally.

148. The biological opinion makes this change while estimating that the project would cause disturbance consuming up to 15.08 percent of an eider's daytime hourly budget. The biological opinion does not acknowledge that its own disturbance estimate exceeds the 12.2 percent figure, does not reconcile its "some flexibility" characterization with the 2025 biological opinion's "no evidence" statement, and does not explain its departure from the 2025 biological opinion's treatment of that threshold.

149. Having concluded that the project would cause incidental take of Steller's eiders and northern sea otters, the biological opinion includes an ITS. In its ITS, the Service set a numeric take limit of one Steller's eider during construction, requiring reinitiation of consultation if more than one eider is taken by collision during the three-year construction period. For the anticipated road-use take of eiders, however, the Service

declined to set a numeric limit and instead adopted a surrogate measure—annual Client Use Days (CUDs) of commercially guided hunting on Izembek Refuge—determining that take would be exceeded, and reinitiation required, if CUDs exceed 1,735 days in any fall hunting season.

150. The 2025 biological opinion concluded that the road would result in one additional bird killed per year from increased subsistence and sport hunting (an annual average of 0.83 eiders via subsistence and 0.22 via sport). The 2026 biological opinion, analyzing the same road and the same increased-access mechanism, instead concludes that inadvertent harvest would increase only from one every 38.5 years to one every 10 years, causing take of five eiders over the 50-year life of the road.

151. The 2026 biological opinion's harvest estimate is roughly one-tenth of the 2025 biological opinion's harvest estimate for the same activity (approximately 5 eiders versus approximately 50 eiders over the 50-year road life), and its total-mortality estimate is roughly one-fifth of the 2025 biological opinion's total (12 versus 58). The biological opinion does not acknowledge the 2025 biological opinion's higher estimates, identify any change in data or methodology, or otherwise explain the reduction.

152. The ITS sets forth reasonable and prudent measures (RPMs) and implementing terms and conditions (T&Cs). The Service stated that these measures are non-discretionary and must be undertaken by the Corps, or made binding conditions of

any permit, for the exemption from the ESA take prohibition to apply. *See* 16. U.S.C. 1536(o)(2).

153. The Service adopted a single RPM to address the incidental take of both eiders and otters. This RPM states, in its entirety, "[e]nsure take is commensurate with the effects analysis of this Biological Opinion." The Service implemented the RPM through two T&Cs applicable to both species. The first requires the Corps to complete mandatory incidental-take monitoring over the lifetime of the road (a duty the Corps may delegate to the applicant or permittee, and which must be made a binding commitment in any maintenance agreement or conveyance of an interest in the road). The second requires the Corps and the applicant or permittee to work with the Service to develop and install signage regarding the presence of listed species and measures to avoid and minimize impacts to them.

154. As applied to Steller's eiders, the single RPM—ensure take is commensurate with the effects analysis of the biological opinion—imposes no obligation beyond keeping take within the levels the opinion already anticipated; it directs no action to reduce the eider take the biological opinion projects.

155. The T&Cs applicable to eiders are limited to monitoring, reporting, and signage. The Corps or applicant must submit an annual monitoring report that includes any observed take of Steller's eiders and the annual CUDs figure used as the eider

incidental-take surrogate, and must report any Steller's eider collision with vertical structures, vessels, or vehicles.

156. Apart from monitoring, reporting, and signage, the ITS imposes no measures directed at reducing expected take of Steller's eiders from inadvertent harvest, vessel collisions, or disturbance from hunting and boating. The measures to reduce eider take through inadvertent harvest, collision risk, and ORV use are discretionary, non-binding conservation recommendations, not RPMs or T&Cs.

157. The Service found that construction of the road, and the increased access to the area that the road would provide, would affect the southwest Alaska DPS of northern sea otters.

158. The Service identified the primary project activities affecting sea otters as (a) disturbance from increased human and vessel activity following construction; (b) injury and death from vessel strikes due to increased vessel traffic; (c) increased subsistence harvest of sea otters facilitated by the road's improved access; and (d) effects on habitat.

159. With respect to designated critical habitat, the Service found that the road would permanently alter local hydrology and modify water quantity and quality flowing into the lagoons, decreasing the quantity and quality of kelp and macroinvertebrate prey species in localized areas of Izembek Lagoon, Kinzarof Lagoon, and Cold Bay. The Service nevertheless concluded that these effects would reach only a relatively small

portion of the critical habitat and would not appreciably diminish its value for the conservation of the species.

160. The biological opinion estimates that project-related vessel strikes would injure or kill up to three sea otters per year in Izembek Lagoon following construction of the road, for the foreseeable future.

161. The biological opinion further estimates that increased access facilitated by the road would result in up to five additional sea otters per year being taken through subsistence harvest in Izembek Lagoon.

162. The biological opinion also anticipates that increased human and vessel activity would result in harassment of an additional, unquantified number of sea otters by significantly disrupting normal behaviors.

163. The Service declined to set a numeric limit for the disturbance-based take of sea otters, instead adopting the same surrogate it used for eiders, finding that take would be exceeded if CUDs exceed 1,735 days in any fall hunting season.

164. The Service stated that an ITS for sea otters is only valid when paired with an accompanying Incidental Harassment Authorization under the Marine Mammal Protection Act, and that it did not include an incidental take authorization for marine mammals at this time because such take had not yet been authorized under that Act. The Service indicated it would amend the biological opinion to add a valid ITS for sea otters following completion of the Marine Mammal Protection Act process.

165. The Service adopted the same single RPM and the same two T&Cs for sea otters that it applied to Steller's eiders. The Service did not adopt any specific measures for sea otters to reduce the take it anticipates from vessel strikes and disturbance.

166. As with eiders, the T&Cs applicable to sea otters are limited to monitoring, reporting, and signage. The Corps or ADOT must report any observed take of northern sea otters, must report the observation of large rafts of 40 or more sea otters in proximity to project activities, and must report sea otter collisions and strandings on defined timelines.

167. The Center provided notice of its intent to bring an ESA citizen suit claim against the Corps by letter dated July 30, 2026. *See* 16 U.S.C. § 1540(g)(2). To Plaintiffs' knowledge, the Corps had not reinitiated consultation to remedy these violations by the date of this filing.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Clean Water Act)

168. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

169. The Corps may issue a 404 permit only "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a).

170. The public notice "must . . . include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful

comment." 33 C.F.R. § 325.3(a). If "there is a change in the application data that would affect the public's review of the proposal," the Corps "will issue a supplemental, revised, or corrected public notice. *Id*. § 325.2(a)(2).

171. The Corps considered and relied on documents that ADOT submitted after the public comment period closed. These documents provided pivotal data that the Corps relied on to make its decision.

172. The failure to provide this information to the public for review and analysis deprived the public of an opportunity to provide meaningful comment on the proposed road and its impacts to Izembek. Because the Corps failed to provide to the public key information that would allow meaningful comment on the permit application, the Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with the CWA, in violation of the APA. 5 U.S.C. § 706(2).

**Second Claim for Relief**
**(Clean Water Act)**

173. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

174. When issuing a 404 permit, the Corps must comply with the 404(b)(1) Guidelines. 33 U.S.C. § 1344(b); 40 C.F.R. pt. 230. The Corps is prohibited from issuing a section 404 permit for discharges if there is a practicable alternative that would have less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a).

175. An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

176. When a project is not "water dependent," the Corps' regulations presume that there are practicable and environmentally preferable alternatives with less adverse impact unless "clearly demonstrated" otherwise. 40 C.F.R. § 230.10(a)(3).

177. The Corps determined that the basic project purpose was to provide public transportation, and thus the project was not water dependent.

178. The Corps too narrowly defined the project purpose such that it unlawfully precludes the existence and consideration of practicable alternatives.

179. There are practicable alternatives to a road, including a marine ferry. The Corps rejected most of these alternatives as not meeting the overall project purpose and the others were not considered.

180. Because the Corps adopted an overly narrow project purpose and eliminated non-road alternatives based on the improper project purpose, the Corps failed to fully consider practicable alternatives and thus failed to select the least environmentally damaging practicable alternative. As a result, the Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with the CWA, in violation of the APA. 5 U.S.C. § 706(2).

**Third Claim for Relief**
**(Clean Water Act)**

181. Plaintiffs incorporate by reference each of the allegations in paragraph 1 through 164.

182. The Corps is prohibited from issuing a CWA section 404 permit for discharges that would "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). When issuing a 404 permit, the Corps must comply with the 404(b)(1) Guidelines. 33 U.S.C. § 1344(b); 40 C.F.R. pt. 230. The 404(b)(1) Guidelines require the Corps to make factual determinations of the effects of the proposed discharge on the aquatic environment. 40 C.F.R. § 230.11.

183. The Corps failed to adequately consider and lacked sufficient information to determine whether the authorized direct, indirect, secondary, and cumulative effects of the discharges may cause or contribute to significant degradation of waters of the United States. 40 C.F.R. § 230.10(c).

184. The Corps failed to demonstrate that the proposed road will not have unacceptable adverse impacts on the ecosystem or cause or contribute to the significant degradation of valuable waters, wetlands, fish, or wildlife.

185. The Corps failed to take "appropriate and practicable steps" to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). The Corps instead relied on inadequate and unenforceable mitigation measures.

186. The Corps failed to require compensatory mitigation for the loss of wetlands due to the project. 40 C.F.R. § 230.91(c).

187. The Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with the CWA, in violation of the APA. 5 U.S.C. § 706(2).

**Fourth Claim for Relief**
**(Clean Water Act)**

188. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

189. The Corps' regulations require it to consider whether the permit is in the public interest, and the "benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a). The Corps' public interest determination failed to consider detriments to Native Villages from the impacts of the road, including increased hunting at Izembek, to the birds they rely on for subsistence and culture.

190. The Corps' determination that the proposed road is not contrary to the public interest lacks sufficient analysis or support. The Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with the CWA, in violation of the APA. 5 U.S.C. § 706(2).

**Fifth Claim for Relief**
**(National Environmental Policy Act)**

191. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

192. NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also id.* § 4336(b) (requiring an EIS when there is a "reasonably foreseeable significant effect").

193. NEPA also requires that agencies take a "hard look" at environmental consequences of a proposed action, including direct, indirect, and cumulative impacts to all potentially affected resources. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); *see also* 42 U.S.C. § 4332(2)(C). The agency's analysis must consider and incorporate accurate scientific analysis. 42 U.S.C. § 4332(2)(D), (E). NEPA documents must contain more than conclusory statements, and the Corps cannot just defer to an applicant's conclusions.

194. The Corps did not complete an EIS prior to issuing the permit. The Corps also failed to take a hard look at the environmental consequences of the project, including direct, indirect, and cumulative impacts to subsistence; eelgrass; birds and wildlife, including ESA-listed species; hydrologic connections and groundwater flow; increased ORV use; erosion and sedimentation; and potential contamination caused by unexploded ordinance, munitions, and contaminated soils.

195. The Corps' reliance on mitigation measures to discount impacts and their significance was arbitrary and capricious and not supported by the record.

196. The Corps failed to satisfy NEPA's requirement to take a hard look at the reasonably foreseeable effects of the project. The Corps' finding of no significant impact lacks support, reasoning, or analysis and is not supported by the record. The Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA. 5 U.S.C. § 706(2).

**Sixth Claim for Relief**
**(National Environmental Policy Act)**

197. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

198. NEPA requires that an agency consider a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C), (F).

199. The Corps set an unreasonably narrow purpose and need for the project, and as a result, only analyzed two action alternatives: the preferred road route and a northern route.

200. The Corps did not analyze any action alternatives that did not involve a road, rejecting those other alternatives as not meeting ADOT's needs. The Corps failed to analyze the marine ferry alternative, despite previously finding that it was technically feasible, 99.9 percent reliable, and cost competitive.

201. Because the Corps set an unreasonably narrow purpose and need and failed to consider reasonable alternatives to a road, the Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA. 5 U.S.C. § 706(2).

**Seventh Claim for Relief**
**(Endangered Species Act)**

202. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

203. In completing a biological opinion and making its jeopardy determination pursuant to section 7(a)(2) of the ESA, the Service must consider whether the aggregate effects of the factors considered in the environmental baseline, effects of the action, and cumulative effects, when viewed against the status of the species, are likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g). A biological opinion must include an ITS for any take that is reasonably certain to occur from the action. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (i).

204. The Service's biological opinion is a final agency action within the meaning of the APA.

205. The Service's biological opinion's jeopardy analysis for Alaska-breeding Steller's eiders and the southwest Alaska DPS of northern sea otters unlawfully concluded that increased disturbances and mortalities from construction and use of the road, when aggregated with other effects of the road, will not jeopardize the existence of

either species, including their reproductive success, productivity, or distribution.

206. The Service's determinations in the biological opinion that the road will not jeopardize the continued existence of Alaska-breeding Steller's eiders or the southwest Alaska DPS of northern sea otters are improper, have no factual or analytical basis in the biological opinion, are not rationally connected to the facts found in the biological opinion, and are not based on the best available scientific data.

207. The Service's incidental take statement does not properly account for, minimize, require the reporting of, or authorize take of Alaska-breeding Steller's eiders or the southwest Alaska DPS of northern sea otters in accordance with the ESA, despite finding that the road will lead to disturbance, injury, and death of both listed species.

208. The Service's biological opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA, in violation of the APA. 5 U.S.C. § 706(2)(A).

**Eighth Claim for Relief**
**(Alaska National Interest Lands Conservation Act)**

209. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

210. ANILCA Title XI provides a "single comprehensive statutory authority" for approving or disapproving transportation systems through conservation system units, including national wildlife refuges, in Alaska. 16 U.S.C. § 3161(c).

211. ANILCA Title XI's requirements include, among other things, compliance

with specific timelines, public involvement, the preparation of an EIS, and eight detailed findings. 16 U.S.C. § 3164.

212. ANILCA Title XI prohibits the authorization of transportation systems through a designated wilderness unless they have been recommended by the President and approved by Congress. 16 U.S.C. § 3166.

213. Neither the Corps nor any other federal agency complied with the mandates of ANILCA Title XI when authorizing the road.

214. The Corps' decision to issue a permit for the construction of a road through the Izembek Refuge without ANILCA Title XI compliance is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, without observance of procedure required by law, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2).

**Ninth Claim for Relief**
**(Endangered Species Act)**

215. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 164.

216. The Corps has a duty as the action agency authorizing the permitted activities to ensure that its actions are not likely to jeopardize the continued existence of any ESA-listed species. 16 U.S.C. § 1536(a)(2). The Corps cannot meet its section 7 obligations for the permit by relying on a biological opinion that is legally flawed. *Id.*

217. The Service's biological opinion is unlawful and thus the Corps' reliance

on that opinion in authorizing the permitted activities is arbitrary, capricious, and in violation of the ESA. 16 U.S.C. § 1536(a)(2).

218. Because the Service's biological opinion is unlawful, the Corps is in ongoing violation of its independent and substantive duty to ensure that the permitted activities are not likely to jeopardize the continued existence of Steller's eiders or northern sea otters, in violation of the ESA. 16 U.S.C. § 1536(a)(2).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A. Enter a declaratory judgment that the Corps' issuance of the permit is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of the CWA, NEPA, ANILCA, and the APA;

B. Enter a declaratory judgment that the Service's biological opinion is arbitrary, capricious, an abuse of discretion, and not accordance with law, in violation of the ESA and APA;

C. Enter a declaratory judgment that the Corps is in violation of the ESA and its implementing regulations by failing to ensure the permitted activities will not jeopardize the continued existence of ESA-listed species.

D. Vacate the Memorandum for Record, permit, and biological opinion;

E. Enter appropriate injunctive relief;

F. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and Endangered Species Act, 16 U.S.C. § 1540(g)(4); and

G. Grant such other relief as this Court deems just and proper.

Dated: October 9th, 2026

Respectfully Submitted,

s/ *Marlee Goska*

Marlee Goska (Alaska Bar No. 2305043)
Rebecca Noblin (Alaska Bar No. 0611080)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiffs*